# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3396

_____

Michael James Kamann

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security[1]

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 12, 2013
Filed: July 30, 2013

_____

Before LOKEN, BRIGHT, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

---

[1]Acting Commissioner Colvin is substituted for her predecessor pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Michael Kamann appeals the district court's[2] grant of summary judgment affirming the denial of his application for social security disability insurance benefits. We affirm.

I

On November 7, 2007, Michael Kamann applied for disability insurance benefits, claiming he had become disabled on March 15, 2001. Kamann has a high school education and previously worked as a lumber handler, surveyor helper, and construction worker. He stopped working in March 2001 because he finished the seasonal job he had been working and was not called back to work.

Kamann, who was 43 at the time of his hearing, alleges disability due to physical and mental limitations following a work-related back injury and an automobile accident. His claim was denied initially, on reconsideration, and after a hearing by an administrative law judge (ALJ). On April 11, 2011, the Social Security Administration (SSA) Appeals Council denied review and the ALJ's decision became the final decision of the SSA. Kamann sought review of the SSA's denial in the district court for the District of Minnesota, which granted summary judgment in favor of the SSA on August 6, 2012.

A. History of Physical Impairments

In 1995, Kamann suffered a back injury while working as a stonemason and underwent two back surgeries within the next few years. Kamann claims the procedures were only partially successful and he has suffered continuous back pain

---

[2]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, adopting the report and recommendations of the Honorable Arthur J. Boylan, United States Magistrate Judge for the District of Minnesota.

since then.  Kamann also reports having been in a car accident in 2000 which hurt his neck, causing pain in his neck, shoulders, and hands.

At the request of the SSA, Dr. Roger Ralston examined Kamann in November 2002 (in connection with an earlier application for disability benefits, which was also denied).  Ralston diagnosed Kamann with chronic back pain syndrome, bilateral hand pain, and mild-to-moderate cervical pain consistent with cervical degenerative disc disease.  Because Kamann exhibited no neurological loss, Ralston suggested he would benefit from additional surgery.  Nevertheless, Kamann sought no treatment for his back for the next five years.

In August 2008, Kamann saw Dr. George Rounds to have a disability form completed.  Kamann complained of back pain.  Rounds noted Kamann's gait suggested some stiffness or pain in his lower back.  Concluding Kamann's pain stemmed from muscle traction, rather than spinal issues, Rounds referred Kamann to Dr. Paul Olson for pain relief procedures.

Kamann saw Dr. Olson in October 2008.  Kamann reported pain throughout his spine and significant headaches.  He reported that any activity might cause discomfort, including lying down, getting up, twisting, bending, and standing. Olson administered an alpha stimulation trial, which significantly reduced Kamann's symptoms. Given the treatment's success, Olson recommended Kamann proceed with the treatments.  Although Kamann's insurance approved him for ten treatments, Kamann only went back for two.

Kamann returned to Dr. Rounds in February 2009 for a follow-up on his back pain.  Rounds' notes indicate Kamann was applying for disability benefits and had been advised to see a neurosurgeon.  Kamann called Rounds's office in November 2009 to request a referral to see a neurologist.  He stated he had a social security hearing scheduled for January and needed the referral prior to the hearing.

## B. History of Mental Impairments

In April 2003, Kamann was involuntarily committed to Miller Dawn Medical Center because of "escalating psychosis." His mother, who lived across the street from him, reported Kamann had become paranoid and may have threatened a neighbor. Upon examination, Kamann was alert, cooperative, and oriented to all spheres; his speech was of normal rate and rhythm. Kamann denied being a risk to himself or anyone else and was released three days later. The hospital physician could not determine whether Kamann's psychosis was drug-induced since he had refused drug screens. At the time, Kamann's mother said he was building a garage and doing all the labor himself, was a tattoo artist and planned to start a tattoo business, and had a very supportive fiancee.

On April 21, 2003, a friend reported to the police that Kamann had threatened to kill him. Police picked up Kamann and brought him into the University Medical Center in Hibbing, Minnesota, where he was assessed as exhibiting paranoid and psychotic behavior. Kamann refused all lab work, causing the treating physician to believe he was on drugs. Ultimately, Kamann did not meet the criteria for involuntary commitment and was released after a seventy-two-hour hold. A hospital nurse noted Kamann had been out of the area for the past two years "working on road construction."

On April 29, 2003, Kamann was again admitted to the University Medical Center at the request of the Itasca County Court for evaluation prior to a court-ordered confinement hearing. Kamann again refused lab work, leading the examiner to believe he was using drugs. Kamann admitted to a history of amphetamine abuse and acknowledged that he sometimes had delusional responses when using amphetamines. He eventually tested positive for cannabis but continued to refuse the metabolic panel. As the substance left his system, Kamann became

generally pleasant and cooperative. His ultimate diagnosis was psychosis, probably induced by substance abuse.

## C. Psychological Evaluations

In December 2007, psychologist Jeffrey Toonstra conducted a mental health consultative examination of Kamann. Kamann told Toonstra he did not get along well with people, avoided contact with people, and stayed home all the time. He told Toonstra he dislikes humanity and considers himself an "extremely dangerous person," although he had never hurt people or animals. Kamann's reported daily activities consisted only of caring for his dogs, cannabis use, watching television, and drinking wine. He reported that he had no positive relationships with family and lived alone. Because Kamann's account of his limitations was inconsistent with Toonstra's observations, Toonstra suspected malingering of psychological symptoms. He ultimately diagnosed Kamann with an unspecified adjustment disorder and personality disorder.

The state agency's reviewing psychologist, Dr. J. Pressner, analyzed Toonstra's evaluation. He concluded there was insufficient evidence to make a decision with respect to Kamann's current mental functioning and gave no weight to Toonstra's opinions because they were based on Kamann's self reports, which were not credible. Dr. Pressner found Kamann's self-report on the disability questionnaire to be clearly exaggerated and contradictory—for example, Kamann denied any form of human contact, yet indicated he obtained food from begging and obtained wine and marijuana for daily use. Dr. Pressner concluded Kamann's condition may be related to drug and alcohol abuse and that his actual level of functioning and limitations could not be ascertained.

Another state agency reviewing psychologist, Dr. Ray M. Conroe, concurred with Dr. Pressner's assessment. He noted Kamann smoked marijuana daily and had no prescriptions or any type of medical care for his problems.

## D. ALJ Hearing and Decision

In January 2010, a disability hearing was held before an ALJ, which lasted only thirteen minutes. Kamann was represented by a non-attorney. A vocational expert testified that Kamann's physical condition would prevent him from performing any of his past work, but that Kamann might be capable of performing certain kinds of light, unskilled work. The ALJ touched briefly on Kamann's mental evaluations and focused primarily on his back injury. Kamann's representative informed the ALJ that a functional capacity assessment had not been performed and Kamann's insurance would not pay for one.

The ALJ found Kamann suffered from the following severe impairments: "chronic back pain syndrome . . . , psychosis (possibly induced by substance abuse), adjustment disorder (unspecified), rule out malingering [sic], personality disorder not otherwise specified, history of cannabis abuse, and history of methamphetamine abuse." Appellant's Addendum 3. Nevertheless, he determined Kamann's impairments did not meet the criteria for benefit eligibility under 20 C.F.R. § 404.1567(b). Specifically, Kamann's back pain was not coupled with neurological loss and, therefore, fell short of the criteria for spine disorders. Kamann's mental impairments resulted only in mild restrictions in his activities of daily living and in social functioning. Finally, the ALJ determined Kamann retained the capacity to perform light work with a number of specified limitations. The ALJ acknowledged Kamann's impairments could reasonably be expected to cause his symptoms, but concluded that Kamann's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Appellant's Addendum 8.

In coming to this conclusion, the ALJ gave great probative weight to the state agency medical consultants' determinations and no weight to psychologist Toonstra's assessment (for the same reasons discussed above regarding Toonstra's reliance upon Kamann's subjective history). With respect to Kamann's capacity, the ALJ noted Kamann had sought infrequent medical treatment despite supposedly disabling symptoms, had taken no pain medications, and had not followed up with specialists for treatment.

The district court determined that, in light of the record evidence as a whole, substantial evidence supported the ALJ's residual functional capacity finding. Kamann now appeals.

II

On appeal, Kamann contends the district court erred in (1) concluding the ALJ adequately developed the record, (2) permitting the ALJ to formulate his own medical opinion, and (3) permitting the ALJ to use an improper standard to discount Kamann's credibility. We review de novo the district court's grant of summary judgment upholding the ALJ's denial of social security benefits. Box v. Shalala, 52 F.3d 168, 170 (8th Cir. 1995). "Our role is to determine whether the Secretary's decision is supported by substantial evidence on the entire record." Id. (quoting Cook v. Bowen, 797 F.2d 687, 690 (8th Cir. 1986)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998) (citing Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997)).

A. Development of the Record as to Mental Impairments

Kamann first contends the district court erred in concluding the ALJ met his basic duty to fully and fairly develop the record as to the material issues. See Snead

v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) ("[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."). Specifically, Kamann notes both agency doctors suggested the record was insufficient to determine the extent of Kamann's mental impairments. Thus, he argues the ALJ should have ordered additional testing rather than concluding based on an insufficient record that Kamann's mental impairments did not meet the criteria for disability benefits.

Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Snead, 360 F.3d at 836; 20 C.F.R. § 404.1512. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). Beyond the medical evidence presented by Kamann, the SSA ordered one psychological evaluation and two additional reviews by agency psychologists. The ALJ then thoroughly reviewed all the medical evidence before him. For the reasons stated by the district court with respect to this issue, we conclude the ALJ met his duty to fully and fairly develop the record. See Kamann v. Astrue, No. 11-1261, 2012 WL 3229413, at *10-11 (D. Minn. July 11, 2012); 8th Cir. R. 47B.

## 2. Functional Capacity Assessment

Kamann next challenges the ALJ's determination that he has the residual functional capacity ("RFC") to perform light, unskilled work. Because psychologist Toonstra opined that Kamann's mental impairments would present an obstacle even to entry-level work and both agency psychologists concluded there was insufficient information to diagnose Kamann accurately, Kamann argues the ALJ's conclusion is unfounded. The SSA emphasizes, in turn, that the determination of a claimant's RFC

at the administrative hearing level is the responsibility of an ALJ alone and is distinct from a medical source's opinion.  20 C.F.R. § 404.1546(c).

Viewing the record as a whole, we find substantial evidence supported the ALJ's determination.  In February 2009, Kamann visited Dr. Rounds in preparation for a disability hearing and self-reported his back pain level as a ten on a ten-point scale.  Admin. R. 389.  Just four months prior, however, Kamann's insurance had approved him for ten pain treatments, of which Kamann sought only two.  Indeed, as the ALJ noted, "[o]verall, [Kamann] has been seen relatively infrequently for his impairments despite his allegations of disabling symptoms[,] . . . has not followed up with specialists for further treatment[,] . . . has taken no pain medications." Appellant's Addendum 9.  With respect to Kamann's failure to seek treatment or take medication, Kamann testified before the ALJ that he would not take any pain medication because of his history with addiction.  The record shows, however, that Kamann received a prescription for percocet in connection with some dental work in October 2009.

The discrepancies between Kamann's self-reported limitations and observed capacity continue.  On his disability report, Kamann suggested he had no family or friends who could complete a third-party function report.  But in fact, Kamann had lived with his mother for a number of years and subsequently lived across the street from her with a girlfriend/fiancée of thirteen years, whose daughter he helped raise. Kamann reported his daily activities as walking to a table and sitting, feeding his dogs, and eating.  However, his mother told a treatment facility in 2003 that Kamann had been building a garage by himself and was a practicing tattoo artist.  As the district court notes, "even the evaluation that Mr. Kamann argues should be given more weight, that of Dr. Toonstra, concluded that there was cause for concern and suspicion that Mr. Kamann was malingering his psychological symptoms." Kamann, 2012 WL 3229413, at *12.  In light of these discrepancies, the ALJ reasonably

rejected Toonstra's opinion—based entirely on Kamann's self-reported condition—that Kamann would have difficulty performing even entry-level work.

Turning to the other medical evidence before the ALJ, the record substantially supports the determination that Kamann is capable of performing light, unskilled labor. Physical examinations conducted in 2002, 2003, and 2008 suggest Kamann possessed a good range of motion and strength in his upper extremities, suffered no spinal abnormalities other than mild scoliosis, and walked with a gait that showed only some stiffness in the lower back. With regard to Kamann's mental impairments, the record suggests doctors suspected each of Kamann's psychotic episodes were associated with drug use. In connection with Kamann's commitment of April 29, 2003, after testing positive for cannabis, Kamann was described as becoming "generally pleasant and cooperative as his substance was leaving his system." Admin. R. 241. Contrary to Kamann's assertion that the record contained insufficient evidence to support a RFC determination, we find the ALJ thoroughly reviewed years of medical evidence on record and issued a finding consistent with the views of Dr. Pressner, the reviewing agency psychologist. Accordingly, the district court correctly upheld the ALJ's determination of Kamann's RFC.

### 3. ALJ's Determination of Kamann's Credibility

Finally, Kamann contends the ALJ used an improper standard to discount his credibility. The ALJ found "[Kamann's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Appellant's Addendum 8. Because credibility should be used to determine a claimant's RFC, rather than using RFC to gauge credibility, Kamann argues he is entitled to reversal.

In our view, this is an argument concerning semantics and nothing more. As discussed above, substantial evidence supports the ALJ's determination that Kamann

-10-

lacked credibility with respect to the presence and extent of his disabling symptoms. In reviewing the ALJ's findings, it is clear the ALJ first developed a credibility determination based on numerous inconsistencies in Kamann's accounts and medical evaluations reporting Kamann's suspected malingering of symptoms. Only then did the ALJ develop Kamann's RFC. This is illustrated by the fact that in assessing Kamann's RFC, the ALJ discredited Toonstra's opinion because (and only after coming to the conclusion that) Kamann lacked credibility. See Appellant's Addendum 10-11. Kamann is not entitled to reversal on this ground.

III

For the foregoing reasons, the district court's grant of summary judgment in favor of the SSA is affirmed.

_____

-11-